664 So.2d 1343 (1995)
Rachel GUZMAN, et al.
v.
STATE of Louisiana, et al.
No. 95 CA 0957.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
*1346 Risley Triche, Napoleonville, for Plaintiffs/Appellees.
Carey Holliday, Baton Rouge, for Defendants/Appellants.
Before CARTER, PITCHER and CRAIN[1], JJ.
CARTER, Judge.
This is an appeal from a trial court judgment in an action for damages.

FACTS
On March 25, 1992, at approximately 11:40 a.m., plaintiff, Rachel Guzman, was traveling in her 1988 Ford Ranger pickup truck in a westerly direction on Louisiana Highway 70 in Assumption Parish. It had just begun to drizzle. As plaintiff entered a curve on Highway 70 near mile post 30, she felt her truck "tilt down on the right side." As plaintiff attempted to control her truck, the truck moved toward the centerline where it began to "yaw."[2] Plaintiff then lost control of her truck and collided with a vehicle on the shoulder of the eastbound lane. That vehicle was driven by Gerald J. Daigle. As a result of the accident, plaintiff sustained serious injuries.
On July 9, 1992, plaintiff filed an action for damages resulting from the March 25, 1992, accident against the State of Louisiana, Department of Transportation and Development (DOTD). Plaintiff alleged that she lost control of her vehicle when it came into contact with a hole located in her lane of travel and with a defective shoulder along Highway 70, making it impossible to regain control of her vehicle and safely return to the highway.
On April 13 and 14, 1994, a trial on the merits was held. The parties stipulated that Highway 70, at or near mile post 30, was under the supervision and control of DOTD on March 25, 1992.
On July 29, 1994, the trial judge rendered judgment in favor of plaintiff in the amount of $791,072.61. Liability was assessed equally between plaintiff and DOTD, and, accordingly, plaintiff's damage award was reduced by 50% to $395,534.30. The trial judge stated that DOTD had a duty to protect a motorist who unintentionally ran off the road because of a hazardous or defective condition of the roadway. The trial court then found that DOTD breached that duty by allowing a three inch drop off (a defective condition) to exist on Highway 70 and that the drop off was a cause in fact of plaintiff's accident. The trial court further found that DOTD knew or should have known of the defective condition of the roadway prior to the accident.
DOTD appealed from the judgment, assigning the following specifications of error:[3]
1. The trial court erred in determining that a three inch drop existed on the westbound shoulder of Louisiana Highway 70.
2. The trial court erred in determining that the three inch drop, which it erroneously determined existed on the westbound shoulder, was a cause of the accident.

*1347 3. The trial court erred in finding that DOTD personnel had actual or constructive knowledge that a three inch drop existed at the time of the accident.
4. The trial court erred in finding that DOTD personnel had actual or constructive knowledge of a three inch drop within a reasonable time to repair the same.
5. The trial court erred in allowing the introduction of previous suits into evidence for any reason.
6. The trial court erred in allowing the introduction of previous suits into evidence to prove notice to DOTD of the condition the court held to be responsible for the accident.
7. The trial court erred in ignoring unrebutted testimony that the edge drop measured less than three inches immediately after the accident.
8. The trial court erred in ignoring unrebutted testimony that the edge drop measured by the plaintiff's agents after the accident in excess of three inches was caused by traffic moving onto the shoulder to avoid plaintiff's vehicle in the middle of the road after the collision.
Plaintiff answered the appeal, alleging that the trial court erred in assessing her with any fault.

LIABILITY OF DOTD
In the instant case, plaintiff alleged that DOTD was liable for her damages based on theories of negligence and strict liability.
In a typical negligence case against the owner of a thing which is actively involved in the causation of injury, the plaintiff must prove that something about the thing created an unreasonable risk of injury that resulted in damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Kent v. Gulf States Utilities Company, 418 So.2d 493, 497 (La.1982). Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably, but nevertheless failed to discover that the thing presented an unreasonable risk of harm. Kent v. Gulf States Utilities Company, 418 So.2d at 497.
However, in a typical strict liability case against the same owner, the claimant is relieved of proving that the owner knew or should have known of the risk involved. The claimant must still prove that, under the circumstances, the thing presented an unreasonable risk of harm which resulted in the damage or that the thing was defective. The resulting liability is strict in the sense that the owner's duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk, the factor which usually gives rise to a duty under negligence concepts. Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. Kent v. Gulf States Utilities Company, 418 So.2d at 497. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in his custody, and the owner, accordingly, will be held liable for failing to take steps to prevent injury resulting because the thing in his custody presented an unreasonable risk of injury to another. Kent v. Gulf States Utilities Company, 418 So.2d at 497.
The basic difference between these theories of liability is that under LSA-C.C. art. 2315 it must be shown that the owner or person in custody either knew or should have known of the risk, whereas, under LSA-C.C. art. 2317, a claimant is relieved of proving the defendant's scienter. Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1027 (La.App. 1st Cir.), writ denied, 605 *1348 So.2d 1378 (La.1992). However, that difference was eliminated by the legislature in the enactment of LSA-R.S. 9:2800 B, which requires, under either theory, proof of a public entity owner's or custodian's actual or constructive knowledge of a vice or defect and its failure to remedy it within a reasonable period of time.[4]
Recently, however, in Rhodes v. State Department of Transportation and Development, 94-1758 (La.App. 1st Cir. 5/5/95), 656 So.2d 650, this court held LSA-R.S. 9:2800 B unconstitutional and, thus, eliminated the necessity for proving prior knowledge on the part of the public entity owner or custodian for purposes of LSA-C.C. art. 2317 liability.
Under either a negligence or strict liability theory, the plaintiff has the burden of proving that (1) the thing which caused the damages was in the "custody" of the defendant, (2) the thing was defective because it had a condition that created an unreasonable risk of harm, and (3) the defect in the thing was a cause in fact of the resulting injury. Farr v. Montgomery Ward and Company, Inc., 430 So.2d 1141, 1143 (La.App. 1st Cir.), writ denied, 435 So.2d 429 (La.1983).
For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83.

A. Custody

The parties stipulated that Highway 70, at or near mile post 30, was under the supervision and control of DOTD on March 25, 1992. Therefore, it is undisputed that DOTD had custody of Highway 70.

B. Defect

In the instant case, critical to plaintiff's action against DOTD as custodian of Highway 70 is proof that her damages were the result of a vice or defect in the roadway, i.e. that it created an unreasonable risk of harm. See Albritton v. J.C. Penney Company, Inc., 385 So.2d 549, 552 (La.App. 3rd Cir.), writ denied, 393 So.2d 727 (La.1980).
Courts have consistently held that an abrupt drop off between a roadway and a shoulder constitutes a defect. LeBlanc v. State, 419 So.2d 853, 856 (La.1982) (4-6 inch drop off); Hood v. State, Department of Transportation and Development, 587 So.2d *1349 755, 759 (La.App. 2nd Cir.), writs denied, 590 So.2d 81, 82 (La.1991) (4 inch drop off); Perez v. State, Department of Transportation and Development, 578 So.2d 1199, 1204 (La. App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991) (8 inch drop off); Deville v. State, DOTD, 498 So.2d 1142, 1144 (La.App. 3rd Cir.1986) (1¾-6¾ inch drop off); Grappe v. State, Dept. of Transportation and Development, 462 So.2d 1337, 1340 (La.App. 3rd Cir.), writ denied, 466 So.2d 1302 (La.1985) (drop off of "several inches"). An implicit necessity for the use of a shoulder is a connection between the roadway and the shoulder which allows for safe, gradual movement from one to the other. Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980); Hood v. State, Department of Transportation and Development, 587 So.2d at 759.
In the instant case, the trial judge determined that Highway 70, near mile post 30, was defective because a three inch drop off existed from the edge of the road to the shoulder. On appeal, DOTD contends that the trial judge erred in finding that a three inch drop off existed. DOTD argues that the trial judge ignored unrebutted testimony that (1) the drop off measured less than three inches immediately after the accident and (2) that the drop off, which was measured several days after the accident and found to be greater than three inches, was caused by traffic driving on the shoulder after the accident in order to bypass the accident scene.
Plaintiff testified that, on March 25, 1992, she was traveling west on Louisiana Highway 70. As she drove past Jessie Dugas' residence, she felt her vehicle "tilt down on the right side." Plaintiff stated that her right tires went off of the roadway, causing her vehicle to become unlevel. Plaintiff then tried to move her vehicle toward the centerline, but lost control and collided with a vehicle driven by Gerald J. Daigle.
Louisiana State Trooper Bryson C. Williams testified that he arrived at the scene at approximately 11:58 a.m. Trooper Williams stated that the accident occurred on Louisiana Highway 70 near mile post 30.6, which is near the residence of Jessie Dugas. Trooper Williams indicated that, within twenty-five to thirty minutes following the accident, he took eleven photographs of the accident scene and surrounding area. According to Trooper Williams, he measured the drop off (the distance between the road and the shoulder), beginning at the Dugas' residence and ending at the point of impact, and found a three inch drop off along the curve area near the Dugas residence. Trooper Williams indicated that it was drizzling when he arrived at the scene and that the road and shoulder area were wet. However, Trooper Williams did not observe any standing water on the shoulder of the road.
On cross-examination, Trooper Williams was asked about exhibit P-17, a photograph which he had taken of the westbound shoulder of Highway 70 near the accident scene. He stated that the area in which he measured the three inch drop off was not depicted in the photograph, but was further to the east of the area depicted, closer to the Dugas residence. Trooper Williams acknowledged that the drop off did not exceed three inches, stating that if it had, it would have been noted. According to Trooper Williams, he examined the westbound shoulder and found no physical evidence that plaintiff's vehicle had entered the shoulder area prior to plaintiff losing control. However, he acknowledged that, when he arrived at the scene, vehicles were driving on the westbound shoulder in order to bypass the accident. Trooper Williams also acknowledged that the traffic could have increased the measurement of the drop off.
Ronald P. Richardson, maintenance superintendent for DOTD, District 61, which includes Highway 70 in Assumption Parish, testified that he is responsible for maintaining the highways and shoulders of his district. Richardson indicated that, on February 26, 1992, approximately one month prior to the accident, a complaint was received of a low shoulder at mile post 30 on Highway 70. According to Richardson, the shoulder area at mile post 30 was patched with aggregate. *1350 Richardson stated that he inspects the roads in his district on a biweekly basis. Richardson indicated that DOTD's maintenance manual does not require repairing of a drop off of less than three inches, but a three to five inch drop off is considered routine maintenance and can be repaired at any scheduled time. A drop off of five inches or more is considered an emergency and must be repaired immediately. Richardson testified that, as of March 25, 1992, or two weeks prior to that, he did not observe a drop off greater than two or three inches.
Lester Richard testified that he was traveling approximately 300 feet behind plaintiff's vehicle prior to the accident. As he approached the curve near the Dugas residence, he saw plaintiff's truck, which was approximately twenty to thirty feet past the Dugas' mailbox, "dip" to the right. He also observed water splash and either gravel or mud splash as plaintiff's truck "dipped" to the right. According to Richard, it appeared that plaintiff's vehicle veered onto the shoulder. On cross-examination, Richard acknowledged that he is a very close, personal friend of plaintiff's attorney and that the attorney had handled a personal injury action for him. Richard insisted that he saw water splash, despite Trooper Williams' testimony that there was no standing water on the shoulder of the road.
Jessie T. Dugas testified that his home is located at mile post 30 on Highway 70. Dugas indicated that there was some drop off in the area west of his driveway. In September or October of 1991, Dugas reported the drop off in front of his residence, but not the drop off in the area west of his driveway. Dugas testified that the highway department repaired the area in front of his residence, but he was uncertain as to whether the repairs extended beyond his driveway. When shown P-25, which was a photograph taken two days after the accident, depicting the aggregate placed on the shoulder in front of his driveway, Dugas acknowledged that the aggregate did not extend, in either direction, beyond his driveway. Dugas stated that, at the time of the accident, there was no standing water on the shoulder of the highway.
Gerald J. Daigle, driver of the vehicle which collided with plaintiff's vehicle, testified that he first noticed plaintiff's vehicle as it was negotiating the curve past the Dugas residence. Daigle observed the back of plaintiff's truck fishtail and veer toward the right shoulder. As plaintiff attempted to steer the truck back to the left, she lost control and collided with his vehicle, pushing his vehicle into the ditch adjacent to the eastbound shoulder. Daigle did not observe plaintiff's truck leave the highway at any time, but he acknowledged that the truck could have left the highway prior to his first observance of it.
Philip Boudreaux, an investigator for the law firm representing plaintiff, testified, via deposition, that he visited the accident scene two days after the accident and took measurements of the drop off along the westbound shoulder of Highway 70. As a beginning point for his measurements, Boudreaux used the point at which the aggregate ended west of the Dugas' mailbox. He then measured the drop off at 25, 60, 85, 100, 152, 190, and 261 feet from the point of beginning. At 25 feet, the drop off measured two and one-half inches; at 60 feet, the drop off measured two and three-fourths inches; at 85, 100, 152, and 190 feet, the drop off measured three and one-half inches; and beyond 190 feet, the drop off measured four inches.
Alfred A. Gonzales, plaintiff's expert in accident reconstruction, testified that vehicles driving on the shoulder in order to bypass the accident could not have created the droppage because it takes a long time for such droppage to form. However, he stated that the vehicles could have increased the size of the drop off by one-fourth to one-half inch.
Dr. Daniel S. Turner testified as DOTD's expert in accident reconstruction, road design, highway safety, and traffic engineering. Dr. Turner indicated that one and one-half to two hours of vehicle traffic on the shoulder could have increased the size of the drop.
After reviewing all of the testimony and evidence, the trial judge determined that, at *1351 the time of plaintiff's accident, a three inch drop off existed from the westbound lane of Highway 70 to the shoulder near mile post 30. This finding is supported by the testimony.
Trooper Williams' testimony indicates that, immediately after the accident, he measured a three inch drop off in the curve area past the Dugas residence and noted this in the accident report. Trooper Williams stated that, when he arrived at the scene, traffic was bypassing the accident on the shoulder. Alfred Gonzales, plaintiff's expert in accident reconstruction, explained that traffic on the shoulder following the accident could not have created the drop off. However, he acknowledged that it could have increased the size of the drop off. Dr. Daniel Turner, DOTD's expert, testified that one and one-half to two hours of traffic on the shoulder could have caused the size of the drop off to increase. Prior to Trooper Williams' arrival at the accident scene and his taking the photographs, the maximum amount of time that could have elapsed was eighteen minutes.
The only other evidence regarding the size of the drop off was that offered through the testimony of Philip Boudreaux who took photographs and measurements two days after the accident. Boudreaux began measuring the drop off just beyond the Dugas residence, measuring at certain distances up to 261 feet from that point. The drop off measured less than three inches up to 60 feet from the point of beginning, but measured greater than three inches from 85 to 261 feet from the point of beginning.
Based on the testimony, the trial judge could have determined that the traffic on the shoulder could not have increased the size of the drop off significantly within such a short time span and that Trooper Williams' measurement of a three inch drop off after the accident was accurate. Our review of the record convinces us that a reasonable basis exists for the trial judge's finding that a three inch drop off existed at the time of the accident. Therefore, the trial judge was not manifestly erroneous in this finding.

C. Cause in Fact

The trial judge determined that the three inch drop off was a cause in fact of plaintiff's harm. DOTD contends that the trial judge erred in making this determination.
Cause in fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause in fact. Roberts v. Benoit, 605 So.2d 1032, 1042 (La.1991). In other words, the inquiry is whether the defendant contributed to plaintiff's harm. Hutzler v. Cole, 93-0486, p. 8 (La.App. 1st Cir. 3/11/94), 633 So.2d 1319, 1325, writ denied, 94-0850 (La. 5/13/94), 637 So.2d 1070.
In the instant case, experts in accident reconstruction, Alfred A. Gonzales and Dr. Daniel S. Turner, testified with regard to the cause of the accident.[5]
Alfred A. Gonzales opined as to how the accident occurred. Gonzales testified that, while plaintiff was negotiating the curve, the right wheels of her vehicle dropped onto the shoulder. As plaintiff tried to reenter the roadway, she oversteered and "sling-shotted" across the centerline. Plaintiff then steered back to the right, throwing her vehicle into a clockwise yaw which allowed the left side to be hit. According to Gonzales, the drop off played a part in the accident.
Dr. Daniel S. Turner opined that the most probable scenario of how the accident occurred is that plaintiff's vehicle entered a short fishtail where the rear of the vehicle swung to the right and corrected back to the left, leading into the yaw that resulted in the collision. Dr. Turner explained that a vehicle fishtails when it loses traction in its rear tires, which results when the side forces on the tire exceed the friction capability of the *1352 pavement. Dr. Turner indicated that the fishtailing could have been caused by wet pavement, a bump, or plaintiff's speed. Dr. Turner studied exhibit P-54, a photograph taken two days after the accident, which showed a hole in the roadway in plaintiff's lane of travel. Dr. Turner indicated that the hole could have contributed to the fishtailing and acknowledged that the drop off played "some part" in the accident.
Our review of the entire record in this matter convinces us that a reasonable basis exists for the trial judge's finding that the three inch drop off was a cause in fact of plaintiff's harm. Therefore, this finding is not manifestly erroneous.

D. Notice/Knowledge

The trial court found that DOTD knew or should have known of the hazardous condition of the highway prior to the accident.
Jessie T. Dugas testified that his home is located at mile post 30 on Highway 70 and that some drop off existed in the area west of his driveway. According to Dugas, in September or October of 1991, he reported to DOTD the drop off in front of his residence, and DOTD repaired the shoulder area in front of his driveway. Dugas viewed a photograph taken two days after the accident, depicting the shoulder area in front of his driveway, and acknowledged that the aggregate did not extend, in either direction, beyond his driveway.
Ronald P. Richardson, maintenance superintendent for DOTD, testified that he is responsible for the maintenance of Highway 70 and its shoulders in Assumption Parish. According to Richardson, DOTD received a complaint on February 26, 1992, of a low shoulder at mile post 30 of Highway 70. Richardson stated that corrective measures were taken and that the shoulder area at mile post 30 was patched with aggregate. Richardson viewed a photograph of the shoulder area fronting Dugas' driveway and stated that the aggregate did not extend beyond Dugas' driveway. Richardson indicated that the most likely reason that DOTD did not extend the aggregate past Dugas' driveway is because DOTD ran out of aggregate. Richardson identified exhibit P-32, which is a February 2, 1992, complaint of a low shoulder at mile post 10 or 19 of Highway 70, and exhibit P-33, which is a February 10, 1992, complaint of a low shoulder at mile post 27 of Highway 70. According to Richardson, Highway 70 "appears to" have had a problem with low shoulders at that time. Richardson viewed a photograph taken on April 30, 1992, approximately two months after the accident, and acknowledged that bituminous asphalt had been placed along the shoulder area near mile post 30, west of Dugas' mailbox where the accident occurred.
Based on the testimony of Richardson and Dugas, as well as the complaint reports and other evidence, we find that a reasonable basis exists for the trial court's finding that DOTD knew or should have known of the drop off and the risk created thereby and failed to correct it within a reasonable time. Therefore, the trial court's finding is not manifestly erroneous.
Because we have found that the trial court was not manifestly erroneous in finding that DOTD had custody of Highway 70, that a defect existed in the roadway (three inch drop off), that the defect was a cause in fact of plaintiff's injuries, and that DOTD had actual or constructive knowledge of the defect and risk created thereby and failed to correct it within a reasonable time, the trial court's finding that DOTD was negligent is not manifestly erroneous.[6]

PLAINTIFF'S FAULT
Plaintiff contends that the trial judge erred in assessing her with any fault.
*1353 It is well settled that the allocation of comparative negligence is a factual matter within the sound discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d 836, 840-41 (La.App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993).
The Louisiana Supreme Court in Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La. 1985), quoting the Uniform Comparative Fault Act, Section 2(b), set forth the guidelines for apportioning fault under the doctrine of comparative negligence. The court stated the following:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, the court listed various factors which may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actors, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d at 974; Hood v. State, Department of Transportation and Development, 587 So.2d at 761.
Since the advent of comparative negligence, a driver straying onto a defective shoulder has been found to be proportionately at fault. Hood v. State, Department of Transportation and Development, 587 So.2d at 760. See Roberts v. State, Department of Transportation and Development, 576 So.2d 85, 90 (La.App. 2nd Cir.), writ denied, 581 So.2d 685 (La.1991); Rochelle v. State, DOTD, 570 So.2d 13, 17 (La.App.3rd Cir. 1990), writ denied, 572 So.2d 93 (La.1991); Cashio v. State, Department of Transportation and Development, 518 So.2d 1063, 1065 (La.App. 1st Cir.1987); Motton v. Travelers Insurance Company, 484 So.2d 816, 822 (La. App. 1st Cir.1986).
The evidence revealed, and the trial judge found, that plaintiff was familiar with Highway 70 and the curve where the accident occurred. Plaintiff had traveled the highway on many occasions. Additionally, the weather was poor, which was an additional factor which the plaintiff should have considered in order to assure that her vehicle did not leave the roadway. Dr. Turner's statement that plaintiff's actions in turning her steering wheel to the left in an effort to move toward the centerline also could have contributed to her losing control of her vehicle supports a finding of negligence on the part of plaintiff.
After considering the evidence and the factors set forth in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d at 974, we conclude that the trial judge's apportionment of 50% fault to plaintiff is not manifestly erroneous.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in all respects. Costs of this appeal, in the amount of $1,640.04, are assessed against DOTD.
AFFIRMED.
NOTES
[1] Judge Hillary J. Crain, retired, is serving as judge pro tempore, by special appointment of the Louisiana Supreme Court.
[2] "Yaw" means that a vehicle's tire rolls and slides simultaneously.
[3] In assignments of error numbers five and six, DOTD assigned as error the trial court's allowing into evidence the introduction of previous lawsuits. Because DOTD failed to brief this issue on appeal, assignments of error numbers five and six are deemed abandoned. See Uniform RulesCourts of Appeal, Rule 2-12.4.

Although the opinion does not address each remaining assignment of error individually, the opinion adequately disposes of all issues raised.
[4] LSA-R.S. 9:2800 B provides as follows:

Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
[5] James Clary, registered civil engineer, testified regarding the improper design of Highway 70.
[6] In Rhodes v. State, Department of Transportation and Development, 94-1758 (La.App. 1st Cir. 5/5/95), 656 So.2d 650, we held that LSA-R.S. 9:2800 B was unconstitutional and that the necessity for proving prior knowledge on the part of the public entity owner or custodian for purposes of LSA-C.C. art. 2317 liability was eliminated.

In the 1995 regular legislative session, the legislature enacted Act 828, which reenacted LSA-R.S. 9:2800. Section 5 of the Act provided that the Act would take effect and become operative, if and when the proposed constitutional amendment of Article 12, § 10 of the Louisiana Constitution contained in the Act which originated as House Bill No. 841, was adopted in the 1995 gubernatorial primary election. The proposed constitutional amendment provided, in part, that the legislature by law may limit or provide for the extent of liability of the state, a state agency, or a political subdivision in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. The amendment was ratified in the October 21, 1995, gubernatorial primary election.
In the instant case, because we have found that DOTD was negligent, it is superfluous to address whether DOTD is also strictly liable. Therefore, we find it unnecessary to determine the effect, if any, of the constitutional amendment or LSA-R.S. 9:2800, as amended.